## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DIRECT RESPONSE PRODUCTS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **1:13-cv-0945-WSD** |
| **WILLIAM S. (SCOTTY) RODERICK,** | |
| **Defendant.** | |

## OPINION AND ORDER

This matter is before the Court on Defendant William S. (Scotty) Roderick ("Roderick")'s Motion to Dismiss [14] and Motion to Compel Arbitration and Stay Proceedings [15], and on Plaintiff Direct Response Products, Inc. ("Direct Response" or "Plaintiff")'s Motion to Amend Complaint [19] .

## I.    BACKGROUND

### A.    Procedural History

On March 25, 2013, Direct Response filed this action asserting against Roderick a claim for a declaratory judgment and claims for breach of contract, tortious interference, breach of fiduciary duty, attorneys' fees and punitive

damages.  On July 16, 2013, after filing his answer, Roderick moved to dismiss the

Complaint under Federal Rules of Civil Procedure 12(b)(1),(3), and (6), on the

grounds that the Court lacks jurisdiction over this diversity action because the

amount in controversy does not exceed $75,000, that venue is improper, and that

Plaintiff has failed to state a claim upon which relief may be granted.  Roderick

also moved to stay the case and to compel arbitration.  Two weeks later, on August

2, 2013, Plaintiff moved to amend its Complaint to provide additional factual

support for its claims.

      B.    <u>Facts</u>

Direct Response stages sales events for car dealerships and is compensated

for these services based on the number of cars sold at each event.  Tim Ball

("Ball") is the president and owner of Direct Response.  Roderick worked for

Direct Response as an independent contractor pursuant to an independent

contractor agreement ("IC Agreement"), which Roderick entered into with Direct

Response on May 1, 2012.  Roderick held the title of Regional Manager for

Plaintiff.

Roderick was responsible for marketing Plaintiff's sales events to

dealerships.  Plaintiff and Roderick agreed to split sales event earnings equally.

Direct Response alleges that Roderick had access to Plaintiff's confidential and

proprietary information, including sales leads, database contents, and marketing materials to perform his sales duties.

The IC Agreement contained six-month non-compete, non-solicitation, and non-disclosure provisions. Neither Roderick nor Direct Response has a copy of the executed agreement, but agree that it once existed. Plaintiff submitted a copy of an unexecuted IC Agreement with the Complaint, and contends it is identical to the one Roderick signed. Roderick contends the agreement he signed had been modified to specify it was void if Ball was no longer the sole owner of Direct Response or if Roderick was required to report to someone other than Ball.

Plaintiff claims that on December 6, 2012, Roderick formed Turn Key Promotions, LLC ("Turn Key") to compete with Direct Response and that on January 8, 2013, Roderick terminated his relationship with Plaintiff, allegedly inducing other members of the Direct Response sales team to join him at Turn Key.

Plaintiff claims that Roderick violated the IC Agreement by competing with Direct Response and soliciting those working for Direct Response, and by using its confidential business information in doing so. Direct Response seeks a declaratory judgment that the non-compete, non-solicit, and non-disclosure provisions of the IC Agreement are enforceable, and it asserts claims for breach of contract, tortious

interference, breach of fiduciary duty, attorneys' fees and punitive damages.
Direct Response alleges damages in the amount of $829,500.

Plaintiff asserts that the Court has jurisdiction over this matter under 28
U.S.C. § 1332, which provides that federal district courts "shall have original
jurisdiction of all civil actions where the matter in controversy exceeds the sum or
value of $75,000, exclusive of interest and costs, and is between . . . citizens of
different States." 28 U.S.C. § 1332(a). Direct Response is a Georgia corporation
with its principal place of business in DeKalb County, Georgia. Plaintiff alleges
that Roderick is a resident of Florida. The parties do not dispute that diversity
jurisdiction is the only asserted basis for federal jurisdiction over this action.

## II.     DISCUSSION

### A.     Plaintiff's Allegations of Diversity

The Court first considers, *sua sponte*, whether diversity jurisdiction exists
where Plaintiff, a Georgia citizen, alleges only that Roderick is a *resident* of
Florida. (See Compl. ¶ 2.)

Federal courts are courts of limited jurisdiction, and thus a federal court
must take care to ensure that it has jurisdiction for all cases that come before it.
Rembert v. Apfel, 213 F.3d 1331, 1333-34 (11th Cir. 2000). To that end, a district
court must always answer the question of whether it has subject-matter jurisdiction

to hear a case, even if a party does not raise the question of jurisdiction by motion. Id.; Smith v. GTE Corp., 236 F.3d 1292, 1299 (11th Cir. 2001) ("[B]ecause a federal court is powerless to act beyond its statutory grant of subject-matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject-matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises.").

"Citizenship for diversity purposes is determined at the time the suit is filed." MacGinnitie v. Hobbs Grp., LLC, 420 F.3d 1234, 1239 (11th Cir. 2005). "The burden to show the jurisdictional fact of diversity of citizenship [is] on the . . . plaintiff." King v. Cessna Aircraft Co., 505 F.3d 1160, 1171 (11th Cir. 2007) (alteration and omission in original) (quoting Slaughter v. Toye Bros. Yellow Cab Co., 359 F.2d 954, 956 (5th Cir. 1966)).

In Travaglio v. American Express Co., the Eleventh Circuit recently held that allegations of mere residence are insufficient to establish diversity jurisdiction. No. 11-15292, 2013 WL 4406389, *2 (11th Cir. Aug. 19, 2013) (publication pending). "Citizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person. Citizenship is equivalent to 'domicile' for purposes of diversity jurisdiction. And domicile requires both residence in a state and an intention to remain there indefinitely." Id. (internal

citations and quotation marks omitted.)  See also Am. Motorists Ins. Co. v. Am. Emp'rs' Ins. Co., 600 F.2d 15, 16 (5th Cir. 1979) (per curiam) ("When jurisdiction is based on diversity of citizenship . . . the plaintiff's complaint must specifically allege each party's citizenship, and these allegations must show that the plaintiff and defendant are citizens of different states.").

The Complaint here fails to show Roderick's citizenship, and the Court is not able to determine whether it has subject matter jurisdiction over this proceeding.  As a result, the Court will be required to dismiss this action, unless Plaintiff files an amended complaint, alleging sufficient facts to support the Court's jurisdiction, or sworn testimony that provides a factual basis for the Court to determine it has jurisdiction over this matter.[1]  See Travaglio, 2013 WL 4406389, at *2–3 (holding that court must dismiss action for lack of subject matter jurisdiction unless pleadings or "sworn" evidence establishes jurisdiction).

The Court next considers Roderick's motion to dismiss this action, pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction. Roderick argues that Plaintiff failed sufficiently to plead an amount in controversy

---

[1] Plaintiff also moves to amend its Complaint to add factual allegations in support of its claims and to withdraw its claim for a declaratory judgment.  Roderick did not oppose Plaintiff's motion.  The Court has reviewed the proposed Amended Complaint, and Plaintiff's Motion to Amend is granted.

that exceeds $75,000, as required in diversity cases.

B.    Motion to Dismiss For Lack of Subject-Matter Jurisdiction

Rule 12(b)(1) of the Federal Rule of Civil Procedure permits dismissal by the Court for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1). Roderick argues that Direct Response failed adequately to plead an amount in controversy that meets the jurisdictional requirements of 28 U.S.C. § 1332(a), and, because the Court does not have a basis to find that the amount in controversy meets the statutory minimum, this action is required to be dismissed for lack of jurisdiction.

1.    *Amount in Controversy in Diversity Cases*

"In order to invoke a federal court's diversity jurisdiction, a plaintiff must claim, among other things, that the amount in controversy exceeds $75,000." Federated Mut. Ins. Co. v. McKinnon Motors, LLC, 329 F.3d 805, 807 (11th Cir. 2003); see 28 U.S.C. § 1332(a).  A plaintiff satisfies the amount in controversy requirement by claiming a sufficient sum in good faith.  St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). "While a federal court must of course give due credit to the good faith claims of the plaintiff, a court would be remiss in its obligations if it accepted every claim of damages at face value, no matter how trivial the underlying injury."  Diefenthal v.

Civil Aeronautics Bd., 681 F.2d 1039, 1052 (5th Cir. 1982).

"Dismissal of a case brought under 28 U.S.C. § 1332 is proper where the pleadings make it clear to a legal certainty that the claim is really for less than the jurisdictional amount." Leonard v. Enterprise Rent a Car, 279 F.3d 967, 972 (11th Cir. 2002) (quotation omitted). "However, where jurisdiction is based on a claim for indeterminate damages, the . . . 'legal certainty' test gives way, and the party seeking to invoke federal jurisdiction bears the burden of proving by a preponderance of the evidence that the claim on which it is basing jurisdiction meets the jurisdictional minimum." Federated Mut. Ins., 329 F.3d at 807. "A conclusory allegation . . . that the jurisdictional amount is satisfied, without setting forth the underlying facts supporting such an assertion, is insufficient to meet the [plaintiff's] burden." See Leonard, 279 F.3d at 972 (quotation omitted) (addressing removal from state court); see also Federated Mut. Ins., 329 F.3d at 809 (noting that a party's mere speculation that the amount in controversy met the jurisdictional threshold did not satisfy its burden of proving beyond a preponderance of the evidence the claim at issue exceeded $75,000).

### 2. *Analysis*

#### i. *Plaintiff's alleged damages*

Direct Response asserts that Roderick's breach of the IC Agreement caused

Plaintiff damages in excess of $800,000. (Compl. ¶ 48.) To support damages in this alleged amount, Direct Response alleges that Roderick induced other sales managers, including Nik Thomas, Mark Nite, Greg Foster, and Charlie Vitale, to terminate their relationship with Direct Response and to join Turn Key. (Id. ¶¶ 33, 39.) These individuals allegedly generated, collectively, over $1.24 million in sales for Direct Response in 2012. (Id. ¶ 33.) Plaintiff also asserts an unspecified claim for contractual attorneys' fees and punitive damages.

ii.     *Damages available for breach of IC Agreement*

In Georgia, "[t]he damages recoverable for breach of a restrictive covenant are lost profits as well as the loss of customers, the loss of employees, and the decreased value of the business property purchased in reliance on the covenant. Indeed, it has been stated that recoverable damages are simply all damages incident to the breach." Ga. Contracts Law and Litigation § 8:13 (2d ed.) (quotations omitted). In some circumstances, such as where an employee wrongfully profits from the use of information obtained from his employer, the measure of damages may be the employee's unjust gain. 2 Callmann on Unfair Comp., Tr. & Mono. § 16:22 (4th ed.).

Plaintiff here alleges that Roderick breached the IC Agreement by, *inter alia*, soliciting Direct Response's employees and inducing them to terminate their

relationship with Direct Response.  As a result, Plaintiff was denied the revenue these employees generated.  Plaintiff alleges this amount was over $800,000 in 2012 – well above the jurisdictional minimum.  These allegations are sufficient to meet § 1332(a)'s jurisdictional amount requirement.  Roderick's motion to dismiss this action for lack of subject-matter jurisdiction based on failure to meet the jurisdictional amount requirement is denied.

    C.    <u>Motion to Dismiss for Failure to State a Claim</u>

Roderick next moves, pursuant to Rule 12(b)(6), to dismiss this action for failure to state a claim upon which relief can be granted.

The law governing motions to dismiss pursuant to Rule 12(b)(6) is well-settled.  Dismissal of a complaint is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  <u>Marshall County Bd. of Educ. v. Marshall County Gas. Dist.</u>, 992 F.2d 1171, 1174 (11th Cir. 1993). The Court accepts the plaintiff's allegations as true, <u>Hishon v. King & Spalding</u>, 467 U.S. 68, 73 (1984), and considers the allegations in the complaint in the light most favorable to the plaintiff.  <u>Watts v. Fla. Int'l Univ.</u>, 495 F.3d 1289, 1295 (11th Cir. 2007).  Ultimately, the complaint is required to contain "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  To state a claim to

relief that is plausible, the plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "Plausibility" requires more than a "sheer possibility that a defendant has acted unlawfully," and a complaint that alleges facts that are "merely consistent with" liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (citing Twombly, 550 U.S. at 557). "To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those conclusions or face dismissal of their claims." Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1263 (11th Cir. 2004) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."). When considering a motion to dismiss, the court normally is required to limit itself to consideration of the allegations of the complaint and any documents attached to it. Fed. R. Civ. P. 12(b)(6).

Roderick argues that Plaintiff has asserted only conclusory allegations without sufficient factual content to support a plausible claim for relief. Roderick, however, discusses in detail the disputed facts related to Plaintiff's breach of contract claim. For instance, Roderick argues that he had cause to terminate the IC

Agreement because Plaintiff failed to support his sales efforts and that, for a period of time, Roderick was required to report to someone other than Ball. (Def. Mot. at 20.) Roderick argues these developments relieved him of the non-compete and non-solicitation provisions of the IC Agreement, and that Ball and Roderick agreed that they would simply "go their separate ways." (Id.) Roderick argues, alternatively, that he did not compete with Direct Response or solicit its employees. (Id. at 21.) Essentially, Roderick disputes the facts alleged in the Complaint. In considering a 12(b)(6) motion, the Court must accept as true the allegations in Plaintiff's Complaint. Hishon, 467 U.S. at 73. The Court concludes that Plaintiff alleged sufficient and plausible factual content to support its breach of contract claim, and Roderick's motion to dismiss for failure to state a claim is denied.[2]

   D.   Motion to Dismiss for Improper Venue

Roderick next moves, pursuant to Rule 12(b)(3), to dismiss the Complaint for improper venue. 28 U.S.C. Section 1391, provides

   A civil action may be brought in—

---

[2] Plaintiff's motion for leave to file an amended complaint indicates that Plaintiff will allege additional facts to support its claims for tortious interference and breach of fiduciary duty. Because the Court has granted Plaintiff's motion to amend, Roderick's motion to dismiss those claims, on the basis of failure to state a claim upon which relief can be granted, is denied as moot.

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C § 1391. Federal Rule of Civil Procedure 12(b)(3) allows a defendant to move to dismiss an action for improper venue. When venue is improper, a district court shall dismiss the action or "if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Whether to dismiss or transfer is within the discretion of the Court. See Pinson v. Rumsfeld, 192 F. App'x 811, 817 (11th Cir. 2006); Naartex Consulting Corp. v. Watt, 722 F.2d 779, 789 (D.C. Cir. 1983).

Plaintiff argues that venue is proper under Section 1391(2) because a "substantial part of the events" giving rise to Plaintiff's claim for breach of the IC Agreement occurred in the Northern District of Georgia. The Eleventh Circuit held that, in considering whether venue is proper under Section 1391(2), "[o]nly the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1371 (11th Cir. 2003).

Roderick argues that when he executed the IC Agreement, he was a resident of Gwinnett County, Georgia, but that he moved to Florida in March 2012, where he has since resided. Roderick argues that the events that gave rise to this action could not have occurred in this district because the territory for which Roderick was responsible as an independent contractor did not include the State of Georgia, and that any alleged breach of the IC Agreement did not occur in Georgia.

Plaintiff contends that the effects of Roderick's alleged breach are manifested in this judicial district, where Plaintiff is located, and that Roderick received training and access to Plaintiff's confidential and proprietary information while he was present in Atlanta, Georgia. Plaintiff also argues that Article 13(f) of the IC Agreement, which provides that "[a]ny and all civil actions regarding [Direct Response] must be processed in the State of Georgia, DeKalb County, Georgia," (Compl., Ex. A ¶ 13(f)), indicates that the parties consented to venue in this district and that the facts alleged support that venue is proper in this district, although Plaintiff does not object to the transfer of to the Middle District of Florida.

In determining whether venue is proper, the Court is required to "focus on relevant activities of the defendant, not of the plaintiff." Jenkins, 321 F.3d at 1371-72. In Jenkins, the Eleventh Circuit examined whether venue was proper in a

case involving a claim for breach of a non-compete agreement, and rejected a "minimum contacts"-style analysis of factors that did not have a close nexus to the actual events that gave rise to the claim for breach. For example, the <u>Jenkins</u> court disapproved of considering where the defendant had attended training classes, a fact that was irrelevant to the alleged violation of a non-compete agreement. <u>Id.</u> at 1372. Instead, the court examined the events that gave rise to the claim, including (i) where the agreement was executed; (ii) where the agreement was intended to be performed; (iii) the location of the business the non-compete agreement was intended to protect; and (iv) "most importantly," where the contract was breached. <u>Id.</u>

Here, the IC Agreement was executed in Georgia, where Defendant resided at the time, and Direct Response, the business intended to be protected by the non-compete provision of the IC Agreement, is located in DeKalb County, Georgia. These factors militate in favor of venue in the Northern District of Georgia. However, Roderick currently resides in St. Petersburg, Florida, and thus that is where Plaintiff expects the non-compete agreement to be performed. Florida is also where Roderick is alleged to have breached the non-compete agreement by operating his competing business, Turn Key. In light of the required focus on Roderick's relevant activities, <u>Jenkins</u>, 321 F.3d at 1371-72, and considering that

the site of the alleged breach, the most important venue factor in this context, is in the Middle District of Florida, the Court concludes that venue properly lies in that judicial district, and not in the Northern District of Georgia.

To the extent Roderick moves the Court to dismiss this action for improper venue, however, that motion is denied. Plaintiff has stated a claim upon which relief can be granted, and the interests of justice require that this matter be transferred to the Middle District of Florida. 28 U.S.C. § 1406(a). Once the Court is satisfied that it has subject-matter jurisdiction over this action, see Section II.A of this Order, *supra*, this case will be transferred.

E.      Motion to Compel Arbitration

Having concluded that venue is not proper in this judicial district and that this action is required to be transferred to the Middle District of Florida if the requirement of federal subject-matter jurisdiction are addressed, the Court declines to reach Roderick's motion to stay this action and to compel arbitration because that determination is best entrusted to the transferee court. Upon review of the parties' submissions, however, the Court expresses its doubt that the arbitration provision at issue is enforceable and offers this evaluation to the transferee judge to whom this action is assigned.

Roderick claims a provision of the IC Agreement requires arbitration. That provision states:

### Article 12: Arbitration

> Use the standard "one shot" provision.
> (as supplemented by the Georgia Rules of discovery, except that the time for discovery shall be limited to a period of 90 days) then in force. The results of such arbitration shall be conclusive and binding, provided, however, that both parties shall have the right to apply to a court of competent jurisdiction for equitable relief as is necessary to preserve and enforce their rights under this Agreement.

(Compl., Ex. A, Art. 12 (boldface in original)) (the "Arbitration Provision"). Roderick argues that this provision requires this action to be stayed pending arbitration of Plaintiff's claims.

Plaintiff first contends that the Arbitration Provision was not part of the parties' agreement, but ultimately concedes that the provision was included in the IC Agreement that Roderick signed. Plaintiff states that the Arbitration Provision was intended to be deleted. (Aug. 1, 2013, Ball Decl. ¶ 5 ("I had intended to remove the arbitration provision before the contracts were signed by the [Direct Response] salesmen. However, I accidentally failed to delete the entire provision.")). Plaintiff then argues that the sentence "Use the standard 'one shot' provision" appears only to be an instruction to include an arbitration clause and the clause, in the form here, is not an enforceable agreement to arbitrate and is not

binding.

Roderick submits an affidavit stating: "The signed agreement I executed with DRP [Direct Response] contained the arbitration agreement as is included at Article 12 in the document attached as Exhibit A to the Complaint. I initialed the page containing the arbitration clause and intended to enforce the arbitration provision." (July 15, 2013, Roderick Decl. ¶ 4.)

### 1. *Legal Standard on Motion to Compel Arbitration*

The Federal Arbitration Act, 9 U.S.C. § 4 ("FAA"),[3] advances the strong federal policy supporting arbitration agreements and Congress enacted it "to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that would be speedier and less costly than litigation." Ultracashmere House, Ltd. v. Meyer, 664 F.2d 1176, 1179 (11th Cir. 1981),

---

[3] The Federal Arbitration Act ("FAA") provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

abrogated on other grounds by, Southland Corp. v. Keating, 465 U.S. 1, 15 n.9

(1984).  In enacting the FAA, Congress sought "to reverse the longstanding

judicial hostility to arbitration agreements . . . and to place [these] agreements on

the same footing as other contracts."  EEOC v. Waffle House, Inc., 534 U.S. 279,

289 (2002); see also Shearson/Am. Express v. McMahon, 482 U.S. 220, 226

(1987) (federal courts should "rigorously enforce agreements to arbitrate").

     The Eleventh Circuit enforces this policy, noting "the Supreme Court has

commanded that 'questions of arbitrability must be addressed with a healthy regard

for the federal policy favoring arbitration.'"  Ivax Corp. v. B. Braun of Am., Inc.,

286 F.3d 1309, 1315 (11th Cir. 2002); see also Picard v. Credit Solutions, Inc., 564

F.3d 1249, 1253 (11th Cir. 2009); Brandon, Jones, Sandall, Zeide, Kohn, Chalal &

Musso, P.A. v. MedPartners, Inc., 312 F.3d 1349, 1357 (11th Cir. 2002).

     The FAA provides that "[a] party aggrieved by the alleged failure, neglect,

or refusal of another to arbitrate under a written agreement for arbitration may

petition any United States district court . . . for an order directing that such

arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

In such cases, federal courts must decide "gateway matters" involving arbitration,

"such as whether the parties have a valid arbitration agreement at all or whether a

concededly binding arbitration clause applies to a certain type of controversy" and

whether an agreement to arbitrate is unconscionable or unenforceable.  See Green

Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003); Jenkins v. First Am. Cash

Advance of Ga., LLC, 400 F.3d 868, 875-76 (11th Cir. 2005).

When determining whether to compel arbitration, "a court must analyze

whether (1) there is a valid written agreement to arbitrate; (2) the issue is . . .

arbitrable under the agreement; and (3) the party asserting the claims has failed or

refused to arbitrate the claims."  Caley v. Gulfstream Aerospace Corp. (Caley I),

333 F. Supp. 2d 1367, 1373 (N.D. Ga. 2004) (citing Lomax v. Woodmen of the

World Life Ins. Soc'y, 228 F. Supp. 2d 1360, 1362 (N.D. Ga. 2002)).

The validity of an arbitration agreement is generally governed by the FAA

and such agreements have the same force and effect as other contracts under state

law.  Caley v. Gulfstream Aerospace Corp. (Caley II), 428 F.3d 1359, 1367-68

(11th Cir. 2005); see 9 U.S.C. § 2 (arbitration agreements are valid and enforceable

"save upon such grounds as exist at law or in equity for the revocation of the

contract").  A court must therefore look to state law to determine whether an

enforceable arbitration agreement exists.  Id. at 1368.

"The basic requirements for a binding contract under Georgia law are (1) a

definite offer and (2) complete acceptance (3) for consideration."  Caley I, 333 F.

Supp. 2d at 1374 (citing Moreno v. Strickland, 567 S.E.2d 90, 92 (Ga. Ct. App.

2002)).  "Georgia law provides that mutual promises and obligations are sufficient consideration to support a contract."  Caley II, 428 F.3d at 1376.

## 2. *Analysis*

Plaintiff and Roderick do not dispute that the IC Agreement is a binding and enforceable contract.  Neither party, however, has a copy of the executed document, and both parties argue that the contract was modified in a manner that suits their immediate interest in this litigation.  Roderick alleges that the contract was modified so that it would be void if Direct Response was controlled by, or if Roderick were ever required to report to, anyone other than Ball.  Direct Response alleges that the arbitration provision was only accidentally included in the document, and that the parties never intended to be bound by it.  Direct Response further argues that the purported arbitration provision, as it is written, is incomplete and insufficient to bind the parties because it lacks any reference to the subject matter to be arbitrated, the arbitration process particulars, including the method of choosing an arbitrator, procedures and rules to be used, or the scope of permissible discovery, all of which Plaintiff contends are typically included in standard arbitration provisions.  (Pff.'s Resp. Br. at 8.)

An arbitration clause does not need to be detailed to be enforceable.  See, e.g., Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1221 (11th Cir. 2000)

(holding that a brief arbitration clause was not too vague and was enforceable, even when it stated only that "any dispute between [the parties] or claim by either against the other" is subject to arbitration).  The failure to designate an arbitration company or a particular forum also is not fatal to an arbitration provision.  When the parties to an arbitration agreement are unable to agree on an arbitrator, a location for the arbitration, or the arbitration company, the court may step in and resolve these issues.  See, e.g., Schulze & Burch Biscuit Co. v. Tree Top, Inc., 831 F.2d 709, 716 (7th Cir. 1987).[4]

An arbitration clause, to be enforceable, must have sufficient specificity to show what is to be arbitrated, even if what is required is minimal.  The Arbitration Provision in the IC Agreement is not only non-specific but does not evidence an agreement to arbitrate any issue or dispute.  In Brown there was, at least, an agreement between the parties "to arbitrate all disputes."  The Arbitration Provision here simply is labeled "Arbitration" but there is no indication of what the parties agreed to arbitrate.  The Arbitration Provision is silent on the scope or purpose of arbitration.  It is possible that such content might have been included in

---

[4] Section 5 of the FAA provides a mechanism for appointment of an arbitrator where "for any [ ] reason there shall be a lapse in the naming of an arbitrator. . . ." 9 U.S.C. § 5.  The Act also provides the location of the arbitration.  Under 9 U.S.C. § 4, "The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed."

the "one shot" provision, but that provision—whatever it might say--was not made a part of the agreement.  What might have been considered to be arbitrated—if anything was in fact considered—simply is unknown.  "[T]he purpose of Congress [in enacting the FAA] . . . was to make arbitration agreements as enforceable as other contracts, but not more so. . . . [T]hough the presumption in favor of arbitration is strong, the law still requires that the parties actually agree to arbitration before it will order them to arbitrate a dispute."  Dreyfuss v. Etelecare Global Solutions-U.S., Inc., 349 Fed. App'x 551, 553 (2d Cir. 2009) (citations and quotations omitted).

In light of the determination that venue is properly in the Middle District of Florida, the Court declines to rule on the motion to compel arbitration.  It is ultimately up to the transferee court to interpret the Arbitration Provision.

## III.    CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant William S. (Scotty) Roderick's Motion to Dismiss [14] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Direct Response Products, Inc.'s Motion to Amend Complaint [19] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff file, or before November 15,

2013, an amended complaint or evidence, consisting of sworn testimony, that identifies Roderick's citizenship.  Failure to comply will result in this action being dismissed for lack of subject-matter jurisdiction.

**SO ORDERED** this 1st day of November 2013.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE